___

**SO ORDERED,**

*Katharine M. Samson*

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: July 24, 2017**

The Order of the Court is set forth below. The docket reflects the date entered.
___

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE: ROBERT A. MUNRO          CASE NO. 17-50039-KMS

       DEBTOR          CHAPTER 13

## ORDER SUSTAINING IN PART AND OVERRULING IN PART
## OBJECTION TO CONFIRMATION AND OBJECTION TO CLAIM

Before the Court is the Objection to Pre-Petition Secured Claim (Dkt. No. 9) filed by Debtor Robert A. Munro and the Objection to Confirmation (Dkt. No. 19) filed by Creditor 21st Mortgage Corporation. The Court held a hearing on the objections on April 13, 2017, and took the matters under advisement. Dkt. Nos. 45, 46. Having considered the arguments and evidence in this case, the Court sustains in part and overrules in part both objections.

### I. Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (K) and (L).

II. Findings of Fact[1]

Robert A. Munro filed a petition for Chapter 13 bankruptcy relief on January 11, 2017. Dkt. No. 1. Munro scheduled his interest in a 2013 Southern Estates 32 x 58 Mobile Home, valued at $40,000. Dkt. No. 4 at 3. Concurrently with his petition and schedules, Munro objected to the secured claim of 21st Mortgage Corporation ("21st Mortgage"), proposing to pay the value of its collateral plus 5% interest. Dkt. No. 9 at 1. On February 2, 2017, 21st Mortgage filed a proof of claim for a prepetition debt of $84,132.51 secured by Munro's mobile home and valuing its collateral at the amount of its debt. Claim 2-1. On February 6, 2017, 21st Mortgage amended its proof of claim. Claim 2-2. On February 9, 2017, 21st Mortgage objected to confirmation of Munro's plan of reorganization, arguing that Munro had undervalued its collateral. Dkt. No. 19 at 1.

On April 13, 2017, the Court held a hearing on both objections and heard testimony from Munro and William Pendergraft, 21st Mortgage's appraiser. Dkt. Nos. 45, 46. Munro testified that his home was worth about $50,000 and elaborated as to its condition. Dkt. No. 49 at 7, 10. He also offered, as exhibits to his testimony, printouts from 21st Mortgage's website showing the value of other similar mobile homes. Dkt. No. 49 at 7-8. 21st Mortgage objected to these exhibits as unauthenticated hearsay; Munro countered that the printouts were statements of a party opponent and that Munro could authenticate them because he had personally observed them on 21st Mortgage's website. Dkt. No. 49 at 8-9. The Court reserved ruling on the admissibility of the exhibits and allowed Munro to proffer his evidence. Dkt. No. 49 at 9. Pendergraft was admitted, without objection, to testify as an expert in the area of mobile home appraisals. Dkt. No. 49 at 21. Pendergraft testified that, based on the cost of necessary repairs, the condition of the mobile home,

---

[1] Pursuant to Federal Rule of Civil Procedure 52, made applicable here by Federal Rules of Bankruptcy Procedure 9014(c) and 7052, the following constitutes the findings of fact and conclusions of law of the Court.

2

and the additional components and accessories,[2] the mobile home was worth $71,347. Dkt. No. 49 at 26. His appraisal report was also admitted into evidence, without objection. Dkt. No. 49 at 22; *see* Dkt. No. 44 at 11-39. After the hearing, the Court took the matters under advisement.

### III. Conclusions of Law

The pivotal question in resolving both the objection to claim and objection to confirmation is the value of 21st Mortgage's collateral, but before the Court may determine a value, it must first determine the admissibility of certain evidence related to valuation.

### A. Admissibility of Evidence

"The Federal Rules of Evidence . . . apply in cases under the [Bankruptcy] Code." Fed. R. Bankr. P. 9017. And as a preliminary matter, the Court finds that the evidence proffered by Munro is relevant to these objections.[3] "Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 402.

---

[2] As part of his testimony, Pendergraft gave an overview of the accessories and components he considered:

> Every manufactured home is different as far as what is installed or built into the home. A standard manufactured home is a metal roof, metal siding. This house had a house type roofing, had a shingle roof, had house type siding on it. It had the upgraded door glaze thermopane windows, carpeting. Components for like bath fixtures a standard manufactured home would just have plastic. This had fiberglass shower stall, garden tub, fiberglass tub combo, porcelain sinks. And then you also add in for kitchen appliances, stove, refrigerator. The microwave I did not give a value for it seeing that it was not working. Then you have items such as your heating and plumbing, your furnace, your water heater and then others. And miscellaneous falls into drapes, curtains, fireplace, smoke detectors. Miscellaneous items such as ceiling fans, upgraded insulation, wind zone II, drywall, this house had a -- it was taped and textured throughout like a site built house on the inside, vaulted ceilings . . . The accessories are items and for a bankruptcy purpose I only list what the lender had told me that was included on the sales contract or came with the home which was a four ton AC unit, a set of steps and the skirting around the home.

Dkt. No. 49 at 25-26.

[3] "To be admissible evidence must be relevant, and the resolution of the question of relevance is in the province of the presiding judge." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 629 F.2d 993, 999 (5th Cir. 1980). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

3

Munro seeks to admit into evidence, as exhibits to his testimony, printouts from a website operated by 21st Mortgage related to the sale of manufactured homes similar to Munro's. 21st Mortgage objected arguing that the exhibits were unauthenticated hearsay. Munro argued that the exhibits were not hearsay because they are statements of a party opponent and that he could authenticate the exhibits because he had personally observed them on 21st Mortgage's website. The Court marked Munro's exhibits but reserved ruling on their admissibility until now. Munro's proffered evidence includes valuations for five manufactured homes. Dkt. No. 43.

1. Authentication

"As a general matter, a document must be authenticated through the submission of extrinsic evidence unless such document falls within a class of 'self-authenticating' documents enumerated in Rule 902 of the Federal Rules of Evidence." *U.S. ex rel. Wuestenhoefer v. Jefferson*, No. 4:10cv12, 2014 WL 7185428, at *8 (N.D. Miss. Dec. 16, 2014). Munro has not argued this evidence is self-authenticating, and the Court does not find it to be.[4] "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "The standard for authentication is not a burdensome one." *United States v. Davis*, 754 F.3d 278, 281 (5th Cir. 2014).

> To be admissible, the proponent must only make a "prima facie showing of authenticity," as "the ultimate issue of authenticity is a question for the jury." *United States v. Alejandro*, 354 F. App'x 124, 128 (5th Cir. 2009) (citing *United States v. Guidry*, 406 F.3d 314, 320 (5th Cir. 2005)). [Federal] Rule [of Evidence]

---

[4] The list of self-authenticating documents is limited to: (1) Domestic Public Documents That Are Sealed and Signed, (2) Domestic Public Documents That Are Not Sealed but Are Signed and Certified, (3) Foreign Public Documents, (4) Certified Copies of Public Records, (5) Official Publications, (6) Newspapers and Periodicals, (7) Trade Inscriptions and the Like, (8) Acknowledged Documents, (9) Commercial Paper and Related Documents, (10) Presumptions Under a Federal Statute, (11) Certified Domestic Records of a Regularly Conducted Activity, and (12) Certified Foreign Records of a Regularly Conducted Activity. Fed. R. Evid. 902. Additionally, effective December 1, 2017, the list will also include: (13) Certified Records Generated by an Electronic Process or System and (14) Certified Data Copied from an Electronic Device, Storage Medium, or File. *Id.*

901 only requires "some competent evidence in the record to support authentication." *United States v. Wake*, 948 F.2d 1422, 1434 (5th Cir. 1991). *Willis v. Allstate Ins. Co.*, No. 2:13cv60, 2014 WL 4702204, at *2 (S.D. Miss. Sept. 22, 2014). A "witness with knowledge" may testify "that an item is what it claims to be." Fed. R. Evid. 901(b)(1).

Munro testified that he visited the website himself and printed the exhibits from the website. This satisfies the authentication requirement. *See Osborn v. Butler*, 712 F. Supp. 2d 1134, 1146 (D. Idaho 2010) (holding that "the standard for admissibility under [Federal Rule of Evidence] 901(a)" was satisfied "because [the affiant] explain[ed] that he printed the website, gave the website address, and represented that it had not been altered or changed from the form maintained at the website address").

2. Hearsay

"'Hearsay' means a statement[5] that: (1) the declarant[6] does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802. The federal rules except from the definition of hearsay a "statement . . . offered against an opposing party" if it:

(A) was made by the party in an individual or representative capacity;
(B) is one the party manifested that it adopted or believed to be true;
(C) was made by a person whom the party authorized to make a statement on the subject;
(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

---

[5] "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a).

[6] "'Declarant' means the person who made the statement." Fed. R. Evid. 801(b).

  (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The Court finds that the values listed for the manufactured homes are statements within the meaning of Federal Rule of Evidence 801. Further, the Court finds that because 21st Mortgage did not contest that it is the owner of the website,[7] these statements are statements of a party opponent and excluded from the definition of hearsay. *See Van Westrienen v. Americontinental Collection Corp.*, 94 F. Supp. 2d 1087, 1109 (D. Or. 2000) (admitting statement made on website as statement of party opponent where party's own correspondence identified website as belonging to it).

  Having found that Munro's exhibits are properly authenticated and not hearsay, the Court admits them into evidence.

  B. Valuation of the Collateral

  Valuation of collateral pursuant to § 1325(a)(5) is governed by § 506(a), which provides that "in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing." 11 U.S.C. § 506(a)(2). Further, "[w]ith respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined." *Id.*

  The parties do not dispute that the manufactured home securing the loan to 21st Mortgage, which Munro is currently using as his residence, is personal property, acquired for personal,

---

[7] From Munro's exhibits, the Court can identify the web address for the homepage of the website as www.21stmortgage.com. Dkt. No. 43.

family, or household purposes. Thus, the Court must determine "the price a retail merchant would charge" for a manufactured home of the same type, age, and condition as Munro's. *Id.*

Property valuation "outside the actual marketplace is inherently inexact," and courts must often assign weight to conflicting valuation testimony in accordance with the credibility and qualifications of the parties' expert witnesses. *In re Grind Coffee & Nosh, LLC*, No. 11-50011, 2011 WL 1301357, at *6 (Bankr. S.D. Miss. Apr. 4, 2011) (quoting *Rushton v. Comm'r*, 498 F.2d 88, 95 (5th Cir. 1974)). But a "bankruptcy court is not bound by valuation opinions or reports submitted by appraisers" and may: (1) "form its own opinion as to the value of property in bankruptcy proceedings"; (2) "accept an appraisal in its entirety"; or (3) "choose to give weight to only those portions of an appraisal that assist the Court in its determination." *Id.* (internal citations omitted).

Having admitted the exhibits offered by Munro into evidence, the Court finds that they demonstrate values of manufactured homes too dissimilar to Munro's to be of much probative value. The five homes in the exhibits are all of different configurations with different features. *See* Dkt. No. 43. Further, the methods used to reach those values are not in evidence, and the Court, therefore, cannot determine whether it would agree with those valuations. The Court, however, accepts Munro's testimony that his home is worth $50,000 as probative but not conclusive evidence of value. *See LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 433 (5th Cir. 1982) (acknowledging "general principle . . . that the owner of property is qualified by his ownership alone to testify as to its value").

Pendergraft, 21st Mortgage's expert appraiser, testified that the home is worth $71,347. Pendergraft reached this valuation using the National Appraisal System ("NAS") form with the National Automobile Dealers Association ("NADA") price guide to come up with a base value for

7

Munro's home. Dkt. No. 49 at 17. "Courts have favored the use of the NADA guide and the NAS to determine the replacement value of manufactured homes." *In re Thornton*, No. 15-6762-RLM-13, 2016 WL 3092280, at *3 (Bankr. S.D. Ind. May 23, 2016) (listing cases). And this Court has similarly favored this valuation method in the past.

> The NADA/ NAS methodology is very formulaic. Under this system, the home's make, model, age and estimated remaining physical life are considered in arriving at the value of the home's base structure—the "box". The base value is multiplied by a "location adjustment" percentage. . . . That figure is multiplied by a "condition adjustment" percentage. The condition of the home is determined by completing a standard form worksheet and assigning a point value to the standard items listed on the worksheet which are typically found within or on the exterior of a manufactured home. The value is further adjusted by taking into account the cost of repairs and any add-on components (upgraded items not typically included in a manufactured home). Those adjustments and corresponding dollar amounts are set out in detailed, itemized worksheets. The NADA guide is based on market information derived from all NADA regions and contemplates use of both the cost and sales comparison approaches, where appropriate.

*Id.* at *2. The Court accepts Pendergraft's valuation as supported by his testimony, with some minor exceptions.

First, the Court questioned Pendergraft at the hearing about the absence of a bill of sale related to certain add-ons, "[t]he AC unit, skirting and steps." Dkt. 49 at 35-36. The bill of sale was not attached to 21st Mortgage's proof of claim, and Pendergraft testified that he never saw an invoice showing these items were sold with the manufactured home but included them in his valuation because 21st Mortgage told him they had been purchased along with the home. This is quintessential hearsay, and the Court finds that 21st Mortgage has produced no evidence showing that these items should be included in the value of its collateral. Therefore, the Court will exclude them from its finding of value. Pendergraft valued the air conditioning unit at $894, the skirting at $366.08, and the steps at $101. Dkt. No. 44 at 19. The Court, therefore, subtracts $1361.08 from Pendergraft's valuation.

Second, the Court disagrees with the repair costs assigned by Pendergraft, finding that they are greatly undervalued. Both Munro and Pendergraft testified that the home was in good condition but in need of some repairs. *See* Dkt. No. 49 at 15, 23. In his appraisal report, Pendergraft listed the total cost for repairs to the home at $2,245. Dkt. No. 44 at 17. Based on the itemized amounts in the appraisal report, however, the Court finds Pendergraft's estimated repair amount should be $2,400. The itemized repairs include releveling the home ($650), patching the roof and resealing the vents ($350), replacing the microwave ($350), painting the ceiling of the utility room and nook ($75), painting the ceiling of the second bathroom ($75), replacing the breaker box ($700), and servicing the air conditioning unit ($200). Dkt. No. 44 at 17. Pendergraft testified about the repairs:

> The repairs on Page 3 [of the appraisal report] I allowed for releveling of the home, because some of the drywall in the home had cracks in it. Then the roof appeared to be leaking in the utility room possibly coming either from a -- most common is where the house is put together the merge line usually the shingles sometimes with the house shifting and all that will cause the roof to leak or usually a seal on one of the vent exhausts up on the roof could be leaking . . .
>
> [Munro] did state the microwave in the kitchen was not working. The ceiling in the utility room and the second bathroom had some mold which is common in the south. Anytime you introduce moisture into a home, you know, you're going to wind up with mold. But this appeared to be possibly from the roof leaking.
>
> Also the breaker box had some corrosion. He opened it up and showed me it looked like possibly some water had dripped down onto it. I allowed for replacing the breaker box. And the AC unit was working fine at the time of the inspection. He did say it needed to be serviced. I just allowed $200 for a service tech to come out, you know to recharge it if it needed to be recharged which gave a total of $[2,400] in repairs.

Dkt. No. 49 at 23-24. Pendergraft further testified that in his opinion, the repair estimates listed in his report were reasonable and that they had come from the NADA, which estimates the cost of repairs based on information provided by "lenders, sales centers and appraisers." Dkt. No. 49 at 24-25. On cross-examination, Pendergraft testified that he was not certified in any kind of mold inspection and that he had not called anyone in to perform a mold inspection to determine the

9

extent of any damage. Dkt. No. 49 at 27. In his view, "[t]he most common way to correct the mold in one of these homes. A lot of people will use a water bleach solution and then spray it with . . . primer. That kills mold." Dkt. No. 49 at 28-29. Pendergraft further testified that he had not gone on the roof of the home to inspect it and had not talked to any roofers about what any repairs might cost. Dkt. No. 49 at 28. Munro testified that he had never called anyone to inspect the roof either, but that for the air conditioning unit, he had already "paid a couple thousand to have it charged and recharged and gone over and the problem wasn't resolved." Dkt. No. 49 at 14.

In the Court's experience and based on the testimony of Munro and Pendergraft about the necessary repairs, the Court finds the estimated repair costs to be insufficient to resolve and remediate the undisputed problems with the home. *See In re Sweeney*, 556 B.R. 208, 217-18 (Bankr. E.D.N.C. 2016) (finding repair estimate to be insufficient because appraiser "did not check to see if, or at least did not report whether" more than cosmetic repairs were necessary when testimony and photographs showed more extensive repairs likely to be necessary). Therefore, using the corrected estimated repair coast, the Court will multiply the overall repair estimate by four, increasing the repair cost to $9,600.

After reducing the value of the home for the unproven cost of the add-ons ($1,361.08) and the increased cost of repairs ($9,600 - $2,245), the Court finds that Munro's home and 21st Mortgage's collateral has a value of $62,630.92.

**IT IS HEREBY ORDERED THAT** the Objection to Pre-Petition Secured Claim (Dkt. No. 9) filed by Debtor Robert A. Munro is SUSTAINED IN PART and OVERRULED IN PART.

**FURTHER ORDERED THAT** the Objection to Confirmation (Dkt. No. 19) filed by Creditor 21st Mortgage Corporation is SUSTAINED IN PART and OVERRULED IN PART.

**FURTHER ORDERED THAT** 21st Mortgage Corporation's collateral is valued at $62,630.92.

*##END OF ORDER##*